UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                        *Plaintiff*,                    :

            - against -                         :
                                                            **15 CR 445 (PAE)**

WALI BURGOS, et al.,                            :

                        *Defendant*.            :

-------------------------------------------------------------------X


**SENTENCING MEMORANDUM ON BEHALF OF
WALI BURGOS**

Christopher Madiou, Esq.
233 Broadway, Suite 2208
New York, NY 10279
(917) 408-6484
chris@madioulaw.com

**Introduction**

This memorandum is submitted in mitigation of sentence on behalf of Wali Burgos, who will be sentenced by the Court on January 13, 2016. On May 26, 2016, the Defendant appeared before Your Honor and entered a plea of guilty to Count 1, Conspiracy to Commit Racketeering in violation of 18 U.S.C. 1962(d). As a part of his plea agreement, Mr. Burgos admitted his participation in the May 29, 2011 second-degree murder of Johnny Moore. He further admitted that on October 2, 2014, he attempted to murder Damar Morales, "Victim-18."

The Pre-Sentence Report ("PSR"),[1] following the parties' Guidelines stipulation, concludes that Mr. Burgos' adjusted offense level is 36.[2] In Criminal History Category II, Mr. Burgos faces a presumptive Guideline imprisonment range of 210-262 months.[3] As discussed below, we agree with Probation's determination that a sentence of 210 months is sufficient but not greater than necessary to achieve the goals of 18 U.S.C. §3553(a).[4] We also ask the Court to credit Mr. Burgos for the time already served in New York state prison for this offense conduct, as authorized by §3553(a), and to run the instant sentence concurrent to the undischarged term of imprisonment imposed on him in New York state on September 10, 2015, pursuant to U.S.S.G. §5G1.3(b), because the state conviction is based on this offense conduct.[5]

Mr. Burgos has admitted to the Court and to Probation that his crimes were violent, tragically misguided and utterly inexcusable. He will live the rest of his life with the memory that he took the life of his own friend, Johnny Moore: a friend since childhood; someone he

---

[1] I have reviewed the PSR with Mr. Burgos; we have made factual corrections and clarifications to Probation, all of which have been incorporated into the final PSR. None of these affected the calculation of the Guidelines range.
[2] PSR ¶ 72.
[3] PSR ¶ 107.
[4] *See*, PSR at pp. 26-28.
[5] PSR ¶ 107.

played basketball with; a young man whose future was extinguished by his friend's hand. There are simply no words that can atone for Mr. Burgos' crimes. However, with his actions, he has made clear that he accepts full responsibility for his crimes and stands ready to be punished.

## I.     Background

### a.   The Offense Conduct

On May 29, 2011, Mr. Burgos, intent on escalating an ongoing gang war, fired multiple shots into a crowd of people whom he believed were members of a rival gang, the Young Gunnas ("YGs"). The shots hit and killed Johnny Moore.[6]

On October 2, 2014, while still actively engaged in the ongoing gang war between his gang, 18 Park, and the YGs, Mr. Burgos shot at and attempted to murder a rival YG gang member, Damar Morales ("Victim 18").

### b.   The Defendant

We do not claim that Wali's gang affiliation, or the criminal conduct he committed as a member, was anything but volitional. But there is a sad predictability to his path: he grew up with his father in federal prison; his mother always worked two jobs; and so, hanging out in the street was his community. What passed for a father figure at home was an abusive, drug-using street dealer, who eventually ended up in jail himself, but not before assaulting both Wali and his mother regularly. When Wali joined a gang, it was not inevitable, but at least understandable: it provided a social structure and status in a peer group that he lacked at home or in school.

Wali Burgos was born on January 9, 1994 to Jacqueline Sheppard, now a New York City detective, and Khalid Burgos, a maintenance worker. Jacqueline was a strong, hard-working mother; but when she was four months pregnant with him, Khalid was arrested on federal

---

[6] PSR ¶ 20.

narcotics charges. Ultimately, he was convicted after trial in the Southern District of North Carolina on August 18, 1993. He was sentenced to ten years in prison on October 28, 1993. Some years later, the household included Jamel Alston, the father of Wali's half-brother. Wali, searching for a father figure, did not find one in Alston, who was a constant physical presence, but decidedly not Wali's parent. He was a doting father to his own son, but not to Wali. Mr. Alston was living in Wali's mother's home and, like Wali, was fully dependent on her. Wali's mother, Jacqueline, always worked multiple jobs and eventually earned her degree so she could move the family out of the Patterson Housing projects and into a better neighborhood in Manhattan.[7] Over the years, while Wali's mother continued to work around the clock, it became apparent that Mr. Alston had a problem with drugs. One day, after witnessing Mr. Alston hit his mother, an increasingly frequent occurrence, Wali tried to call the police. Mr. Alston stopped him and pushed Wali to the ground. Eventually, Alston was arrested on state drug charges and was incarcerated for eight months. After the conviction, Wali's mother left him for good.

When Wali's father emerged from prison, he tried to become a full-time parent. However, as he explained in his letter to the Court,[8] Khalid Burgos wished he was "a different Dad. A more strict Dad. [He] felt that missing all this time in [Wali's] life made [him] less disciplined with [his son]." Khalid explains, frankly, "I was more of his buddy." Something that Wali did not need. While his father was incarcerated, Wali had found the acceptance he was looking for, but under the worst circumstances. After years of "hanging out," Wali formally joined a gang when he was 13—he was also using marijuana daily and frequently drinking.

---

[7] PSR ¶ 88.
[8] Attached hereto, along with other letters from Mr. Burgos' family, as Exhibit A.

On July 6, 2010, while Wali was hospitalized for a head injury,[9] one of his closest childhood friends, Mayvon Chapman, was shot and killed by members of the YGs.[10] Khalid describes an immediate shift in Wali: "[m]y son (and many of his friends) were never the same. Just like that things changed. Wali was always a quiet and introverted kid but after Mayvon was killed it was different."[11] Wali's grades declined; he was truant; he lost interest in basketball and smoked more and more marijuana. He took comfort in gang life and relationships and rejected his family.

During the year following Mayvon Chapman's murder, Wali's neighborhood was rapidly becoming a war zone. The gangs "18 Park" and the "YGs," once affiliated, were now bitterly fighting and violence was growing exponentially. During 2011, Wali was jumped and badly beaten twice by members of the YGs. On May 29, 2011, Wali was again, for a third time, jumped and severely beaten by the YGs.[12] Immediately after, in a blinding rage, he searched for a gun and vowed revenge.[13] He drove to an area where he knew the YGs were and fired indiscriminately into a crowd of people, killing his childhood friend, Johnny Moore.[14]

On August 5, 2011, Mr. Burgos turned himself in to New York City law enforcement after a warrant was issued for his arrest. For the next two years, he was jailed at Rikers Island awaiting his state trial in the Bronx. Mr. Burgos was acquitted of all charges on October 22, 2013. He was released that day after 2 years, 2 months and 17 days of incarceration.

---

[9] Mr. Burgos, after smoking marijuana at a friend's house all day, fell down a flight of stairs. He lost consciousness and was taken to the emergency room for a small skull fracture. He spent two days in the hospital while recovering from the injury.
[10] *See*, Trial Transcript at pp. 1264-1268, *United States v. Amarizan et al.*, 15 CR 445 (PAE) ("Trial Tr." herein).
[11] *See*, Exhibit A.
[12] Trial Tr. at 1287.
[13] *Id*. at 1288-1289.
[14] *Id*. at 1291-1296.

When he returned home, he had a new status among his friends and in the neighborhood. 18 Park was still very much at war with the YGs and the acquittal seemed, perversely, to be a victory for the 18 Park side. Mr. Burgos came home a gang hero—he beat a state murder charge. He immediately began associating with the same toxic crowd and was emboldened by both his peers and older members of the gang. As 18 Park celebrated the acquittal, the YGs continued to target Mr. Burgos and his friends.

During the Summer of 2014, Mr. Burgos was jumped again by a group of YGs while walking with his girlfriend—his face was slashed with a scalpel and his back stomped on repeatedly, causing injuries he suffers from today. A rage was building, fueled by the humiliation of being beaten, stomped and slashed eye-to-jaw, unable to defend himself as his girlfriend looked on. On October 2, 2014, in a coordinated attack, Mr. Burgos, along with other members of 18 Park, attempted to kill a member of the YGs, Damar Morales, in the courtyard of the Patterson Houses in retaliation for the assault on Mr. Burgos. Mr. Burgos fired multiple shots in Mr. Morales' direction, narrowly missing him.

Mr. Burgos was arrested the same day. He pleaded guilty to Criminal Possession of a Weapon in the Second Degree, and on September 10, 2015, he was sentenced to serve four years in prison with four years' post-release supervision.[15]

On January 7, 2016, 241 days into his state sentence, Mr. Burgos was writted into Federal Custody and arraigned on the instant indictment. On May 26, 2016, Mr. Burgos appeared before the Court and pleaded guilty to Count One and admitted to Your Honor his involvement in both the shooting death of Johnny Moore and the attempted murder of Damar Morales. At the time of

---

[15] PSR ¶ 75.

his plea, he was not formally indicted for the second-degree murder of Johnny Moore. He was the first defendant to accept full responsibility for his actions as a member of 18 Park.

**II.** **Argument**

a. Acceptance of Responsibility

Mr. Burgos' acceptance of responsibility for the murder of Johnny Moore, before he was formally indicted, deserves consideration at sentencing pursuant to § 3553(a)(1). The Guidelines attempt to restore justice after criminality and "further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation."[16] But there are inherent limitations to its formulaic approach, as the Sentencing Commission admits: "The appropriate relationships among [sentencing] factors are exceedingly difficult to establish, for they are often context specific. […] Thus, it would not be proper to assign points for each kind of harm and simply add them up, irrespective of context[.]"[17]

By his plea of guilty, Mr. Burgos "truthfully admit[ted] the conduct comprising [his offenses] of conviction, and [did not] falsely [deny] any additional relevant conduct for which [he] is accountable [for.]"[18] He is, therefore, afforded a three-level reduction off his combined adjusted offense level of 39. But the quality of his acceptance is fundamentally different than most defendants similarly situated, and is thus, worth exploring. The manner and timing of Mr. Burgos' acceptance, along with the rejection of his past affiliations is the kind of nuance that cannot be reflected in a Guidelines calculation.

---

[16] U.S.S.G. Ch. 1 Pt. A (2).
[17] U.S.S.G. Ch. 1 Pt. A (3).
[18] U.S.S.G. § 3E1.1, comment. (n.1(A)).

Public acknowledgement of wrongdoing is, of course, a critical step toward justice and ideally, in cases such as this one, the first step toward reconciliation and healing.

> At heart, the apology depends on a paradox. No matter how sincere, an apology cannot undo what was done, and yet "in a mysterious way and according to its own logic, this is precisely what it manages to do." An apology is inevitably inadequate. […] The mystery of apology depends upon the social relationships it summons and strengthens; the apology is not merely words.[19]

Mr. Burgos' conviction and sentence cannot undo the harm he has done to Johnny Moore's family nor the community which suffered from his involvement with gang violence. Accepting full responsibility is ultimately all he can do—and the way he did so is unique and evinces an apology that is "not merely words." When Mr. Burgos was writted from New York state custody in January of 2016, the government did not have probable cause to indict him in the murder of Johnny Moore. When he pleaded guilty to the murder in May of 2016, he did so before being formally indicted. Indeed, he was the first defendant to plead guilty in this 26-co-defendant case by three months.

When Mr. Burgos, a prominent member of 18 Park, admitted involvement in a Racketeering Conspiracy, and thus admitted to 18 Park's existence and criminal purpose, it was not a popular decision. It was especially unpopular while incarcerated at the MCC, where his friends and co-defendants were also housed. It was unpopular still to plead to a crime which he had not been formally accused of. And it was unthinkable to plead guilty to a crime that he was acquitted of in State court three years earlier—the same acquittal that made him a celebrated and larger-than-life figure in the 18 Park. It was a decision that was antithetical to everything he had done and been for the last decade of his young life. Mr. Burgos' decision to publically admit to his crimes, and his involvement in 18 Park, was a rejection of the community he was apart of for

---

[19] Martha Minow, *Between Vengeance and Forgiveness: Facing History After Genocide and Mass Violence* p. 114 (1998).

most of his young life, a rejection of the lifestyle he was encouraged to believe in, and, ultimately, a surrender to punishment for the harm he inflicted.

Again, § 3E1.1 has no room for historical context or significance. Nor would it be possible to numerically account for "ultra" acceptance of responsibility.[20] Three levels are deducted for accepting responsibility in a timely manner for saving the government and Court time and money. But here, the history and significance implicit in Mr. Burgos' acceptance is not properly reflected in a three-level reduction. The audacity it took to stand up to his peers is not reflected. The courage to stand before his victims, the Moore family, both at his plea hearing and at sentence and publically say, "I caused this death; I am sorry; and I am ready to be punished" is also not reflected.

His personal history intimated a different course of conduct: his father went to trial when he was accused of drug trafficking in North Carolina; he himself was acquitted after trial. The entire ethos of gang life rejects the idea of "rolling over" easily in the face of prosecution. But despite that deeply personal history, he made the *right* decision and accepts its consequences, both legally and socially. And so, his acceptance is different than most. If Mr. Burgos pleaded guilty two months before trial, there would be no basis to withhold § 3E1.1's three level reduction, yet the quality of the acceptance would be decidedly different. The context of his acceptance, considering his unique history, does, in fact, matter and should be viewed in a different light than others that may be afforded the same reduction, but under qualitatively different circumstances.

---

[20] Under the pre-*Booker* Guidelines regime there was a basis for departure for "extraordinary acceptance of responsibility." *See United States v. Rogers,* 972 F.2d 489, 492 (2d Cir. 1992) (noting that "extraordinary acceptance of responsibility" may, in appropriate cases, provide basis of departure).

b.   Psychiatric and Neuropsychological Evaluation

Mr. Burgos' age, drug use, and the state of his adolescent brain development at the time of the Johnny Moore murder also deserves consideration pursuant to § 3553(a)(1). Mr. Burgos' tragic and amoral response to the shooting death of his friend, Mayvon Chapman, and the YGs' attack on him earlier that day, was made when he was an 18-year-old adolescent, filled with rage and clouded by daily marijuana use.

There is a wealth of study on the confluence of substance abuse and the adolescent brain— "The adolescent brain is often likened to a car with a fully functioning gas pedal (the reward system) but weak brakes (the prefrontal cortex)."[21] The Supreme Court has recognized that

> compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility'"; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed." […] Accordingly, "juvenile offenders cannot with reliability be classified among the worst offenders." A juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult."[22]

At the request of counsel, Mr. Burgos participated in an independent neuropsychological and psychiatric evaluation by Alexander Sasha Bardey, M.D. and Kate Termini, Psy.D. at the Metropolitan Correctional Center on July 13, 2016, August 10, 2016, and August 25, 2016. In conducting this evaluation, Drs. Bardey and Termini reviewed Mr. Burgos' personal, social, educational, vocational, and psychiatric history, and reviewed his understanding of the circumstances that led to his arrest.

---

[21] *Principals of Adolescent Substance Use Disorder Treatment: A Research-Based Guide*, National Institute on Drug Abuse, https://www.drugabuse.gov/publications/principles-adolescent-substance-use-disorder-treatment-research-based-guide/introduction (last visited December 23, 2016).
[22] *Graham v. Florida*, 560 U.S. 48, 68 (2011)(internal citations omitted).

They found that Mr. Bugos' "thought process [was] logical and goal directed. He was a good historian, providing a detailed account of his life." Mr. Burgos confided that he has experienced "poor sleep since 2010, after the death of his friend," Mayvon Chapman. Mr. Burgos added that his dreams since the killing were "fucked up." Mr. Burgos reported that after Mayvon Chapman's murder, he was "always angry, yelling with my mother, blanking out a lot," and being more impulsive.

After their evaluation[23] was complete, Drs. Bardey and Termini ultimately diagnosed Mr. Burgos with "Antisocial Personality Disorder" and "Marijuana Use Disorder, Moderate." They found "Mr. Burgos' intellectual functioning is in the Borderline to Low Average range." They observed that his "academic performance was well below grade level, though given his reports of truancy and marijuana use in high school, it is not surprising that his academic abilities are on the lower end."

Not surprisingly, they found that "from an emotional and psychological perspective, Mr. Burgos appears to have become completely acculturated to a gang life, espousing its codes of conduct, sense of loyalty, and commitment to redressing perceived slights and affronts." They observed that his "early life appears to have been relatively benign from a developmental standpoint," but "his progress appears to have been derailed during adolescence." They found that the loss of his friend, Mayvon Chapman, to gang violence "contributed significantly to his substance abuse, school truancy and, ultimately, his association with a gang," and ultimately

_____

[23] The following is a list of neuropsychological tests which were administered by Drs. Bardey and Termini in aid of their diagnoses: *Test of Premorbid Functioning (TOPF); Wechsler Adult Scales of Intelligence – Fourth Edition (WAIS-IV); Wide Range Achievement Test – Fourth Edition (WRAT-4); Trail Making Test; Controlled Oral Word Association Test (COWAT), FAS, Animals; Wisconsin Card Sorting Test (WCST–64 item); Wechsler Memory Scale 4th edition (WMS-IV), Logical Memory; California Verbal Learning Test 2nd Edition (CVLT-2); Rey-Osterrieth Complex Figure Test (RCFT); Test of Memory and Malingering (TOMM).*

found that "Mr. Burgos' emotional maturation appears to have remained stalled in adolescence." In terms of Mr. Burgos' development, "[a]lthough science informs us that the adult brain isn't formed until the mid-20's, it seems that Mr. Burgos' progress has been even slower." They concluded that his "decision-making, lack of consequential thinking, poor judgement, and 'black and white' analysis of situations are all consistent with the immature brain of a young adolescent, rather than the brain of an adult."

To be clear, the above observations are not offered to excuse Mr. Burgos' unjustifiable conduct. Rather, in aid of sentencing, and in furtherance of §3553(a)(1)'s call to evaluate the unique history and characteristics of the defendant, consideration of Mr. Burgos' adolescent brain development, and the myriad factors which affected that development, is appropriate. Certainly, as Justice Kennedy observed, a "juvenile is not absolved of responsibility for his actions, but his transgression" but because of the nature of adolescent brain development, and its inability to deal with trauma—the death of a friend, drug use and high susceptibility to peer influence—Mr. Burgos' crimes are "not as morally reprehensible as that of an adult."[24]

c.  Consideration for Time Served

We agree with Probation that Mr. Burgos' instant sentence should run concurrent with the remaining time he has left to serve on his four-year sentence for his conviction of Criminal Possession of a Weapon in the Second Degree in New York state, pursuant to U.S.S.G. § 5G1.3(c).[25] Mr. Burgos' state sentence is currently running and the maximum expiration date of that sentence is January 16, 2019. The offense of conviction in New York state is identical to the instant offense conduct, i.e., the attempted murder of Damar Morales. The New York state

---

[24] *Graham*, 560 U.S. at 68.
[25] PSR ¶ 107.

offense is relevant conduct as defined in U.S.S.G. § 1B1.3 and therefore "the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment."[26]

Separately, we ask the Court to factor the 2 years, 6 months and 17 days Mr. Burgos spent in custody while detained at Rikers Island pending trial in the Bronx for the Johnny Moore murder[27] and the 241 days served on his New York state Criminal Possession of a Weapon sentence,[28] pursuant to § 3553(a), when fashioning a sentence that is sufficient but not greater than necessary. It is appropriate to take both periods of time into account because (a) they represent time in custody for the offense conduct currently before this Court and (b) the time will not be otherwise counted by the BOP, nor is it a "undischarged term of imprisonment" considered under U.S.S.G § 5G1.3. The conditions under which Mr. Burgos was detained at Rikers Island are also similar to those he would be subjected to by BOP under a federal sentence, if not substantially worse. Therefore, in fashioning a sentence which is sufficient, but not greater than necessary, and when considering all relevant factors, we respectfully ask that Mr. Burgos' uncounted time in state custody be considered in the Court's § 3553(a) analysis.

    d.   A Reasonable Sentence

The Supreme Court has said that the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[29] The district court must make an "individualized assessment" of the

---

[26] U.S.S.G. § 5G1.3(c).

[27] "The defendant was incarcerated by New York state while he faced state charg[es] relating to the death of Johnny Moore from August 5, 2011 (the date of his surrender), until October 22, 2013 (the date of his acquittal), for a total of 2 years, 2 months and 17 days of incarceration." PSR ¶ 74.

[28] PSR ¶ 75.

[29] *Pepper v. United States*, 562 U.S. 476, 487 (2011)(*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)).

sentencing warranted by §3553(a) "based on facts presented" and "may not presume that the Guidelines range is reasonable."[30] The deference granted to a district court's determination springs from its "singular advantage of actual and extensive sentencing experience," as well as "its familiarity with the individual case and the individual defendant before it."[31]

Here, we agree with Probation that, when considering all relevant factors, 210 months of imprisonment is a sufficient sentence for Mr. Burgos' criminal conduct, but not greater than necessary. Probation, justifying its recommendation, states

> We acknowledge that the defendant's past life experiences of lacking a paternal presence for 10 years of his life due to incarceration, the tragic loss of his friend, and past assaults that he endured are all extremely unfortunate occurrences for one to bear. We can also acknowledge that these past experiences may have impacted his past decision making skills; however, playing a role in furthering violence in the community is never the solution to conflict amongst differing individuals.[32]

We agree. Mr. Burgos' unique history and characteristics, along with his age and lack of maturation at the time of the offense conduct make a 210 month sentence reasonable. However, Probation does not factor in the over two years of incarceration Mr. Burgos has served against that time. We ask the Court to do so when it fashions a sentence that is sufficient, but not greater than necessary to achieve the goals of 18 U.S.C. § 3553(a).

---

[30] *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008).
[31] *Id*. at 170.
[32] PSR p. 27.

### III.    Conclusion

Finally, we note that "forgiveness does not and should not take the place of punishment. Forgiveness marks a change in how the offended feels about the person who committed the injury, not a change in the actions to be taken by a justice system."[33] For his part, Mr. Burgos has accepted responsibility for his crimes. At sentence, he will publicly apologize to his victims. He has also accepted responsibility in a manner which *evinces* an apology rather than a hollow acceptance. He stands ready for punishment. But he is also a young man of who is eminently redeemable; a young man who can one day live a productive, instructive life, after he emerges from prison. As his family's letters show, he will have tremendous support, encouragement, and an example already set by his father, to do just that.

In closing, we wish to observe that there is—or there should be—a place in criminal sentencing for Mercy. It is not a word found in the Sentencing Guidelines, and it is likewise not to be found in §3553. But, we believe, there is a role for it in connection with sentencing. Yes, punishment promotes respect for the law; and yes, punishment is instructive to others. But we believe that mercy shown to Wali Burgos, especially considering *how* this young man accepted responsibility for his criminal conduct, would also promote respect for the law, and would instruct others that fairness and individualized sentencing determinations are possible.

Respectfully submitted,

_____
Christopher Madiou, Esq.
*Counsel for Wali Burgos*

New York, New York
December 30, 2016

---

[33] Minow *supra* at 15.

# Exhibit A

December 16, 2016

Dear Judge Engelmayer,

My name is Frank Khalid Burgos. I am the father of Wali A. Burgos. Writing a letter for your only child in this situation has truly been the hardest thing I've had to do in my life. Not in my worst nightmare did I ever think we as a family would be in this position. But the reality is, we're here. I ask you to please bear with me while you read this letter. I will probably be rambling and going different places but I assure you every word will be sincere, honest and from my heart.

First I want you to know that Wali is truly remorseful for taking Johnny Moore's life. From the day it happened (late may 2011) Wali has been haunted and regretful for his actions. It's safe to say now that Johnny was not Wali's target. Wali and Johnny were friends. Wali was jumped on two separate occasions and took his anger and emotions too far and was extremely reckless in his behavior. Me and my entire family pray (to this day) for Johnny and his family.

I have no problem saying with confidence that I come from a good family. A God fearing, very close knit family. We are always there for each other and will undoubtedly be there for Wali. He has 100% support. I know this because there was a time I was in the same position as Wali. During my senior year in college I was arrested and charged with conspiracy to sell crack cocaine. As disappointed as my Mother, Father and the rest of my family were, they stuck by me from the beginning to the day I came home. On the exact day I was arrested, ironically, I found out that my girlfriend was pregnant! It was a shock to say the least because with both of us being in school we took steps to avoid this. So from the moment I knew Wali was special and meant to be. Even though I was facing 10 years in prison, it was a no brainer to keep our baby. It's a decision we never regretted, but unfortunately I was convicted and sentenced to 11 years in federal prison. I did not see the birth of my son Wali. My mother told me I became a father on the phone. It was the best and worst day of my life. It's not an excuse, but I believe not having me there for the first 8 and half years of his life had a huge impact. When I did

get home I immediately took custody (with Jackye's blessing) of Wali. I often look back and wish I was a different Dad. A more strict Dad. I felt that missing all this time in his life made me less disciplined with him. I was more of his buddy. I love my son and our relationship. I just wish I was a little harder on him at times. Even in saying that, I don't know where I could've been different or harder, because Wali was a great kid. He has never been a kid who talked back or was disrespectful. He was never a problem for his teachers. He was never suspended and I was never called by a teacher with a bad report. One of the proudest days of my life was when Wali came home and said he made the varsity basketball team! As a freshman! I didn't play varsity until my junior year. Wali still doesn't let me forget that. Not too long after that, Wali lost one of his closest friends Mayvon Chapman who was shot and killed. My son (and many of his friends) were never the same. Just like that things changed. Wali was always a quiet and introverted kid but after Mayvon was killed it was different. This isn't an excuse for his behavior, but from that one killing, a back and forth rivalry started and us as parents were helpless. I didn't grow up in gangs in my neighborhood. Now in this same hood gangs became prevalent and I was completely naive to this as was other parents I'm sure. I honestly thought I kept my son away from this.

I write this letter pleading to you to please be as lenient as possible in giving Wali his time. He's young and can still be a productive member of society. After 10 years in prison I came home and recovered a very productive life. I have been with my wife for 13 years and have been married for 6 years. Early next year we will be purchasing our first home. I work two full time jobs in addition to writing, producing and playing the lead role in a stage play that my brother directs. I came home in September 2002 and have not been in trouble since. I 100% believe with all the same support Wali will also come home and be just as productive as I have been. I thank you for the time you took to read my thoughts and words. I pray it has shed some light and insight on my son.

Thank you,

Khalid Burgos

December 11, 2016

Dear Judge Engelmayer,

My name is Jacqueline Sheppard, Wali Burgos' mother. I wish I did not have to write this letter as I am having a difficult time. I want nothing more than for my son to be with his family. Wali has two younger siblings that miss him terribly. This situation has affected them both as well. I am aware of the crimes my son has committed. I also understand that Wali must be punished and be held accountable for the crimes he has committed. For me, all this started when my son's good friend Mayvon was killed. I am not saying this to excuse anything he has done, but as a mother, I saw a change in Wali almost immediately.

I would like for you to get a sense of who Wali is beyond that. Wali comes from a good working class immigrant family. My son grew up with morals and respect. I was a young mother when I had him and I worked hard and did the best I could. I worked full time, earned my degree and achieved my goals. I worked hard to put my son in private school. I was trying to get him away from the bad elements in the community. I taught my son to be respectful of others. Wali is a caring and loveable person. When he was about 8 years old he asked for 300.00 dollars so he can give to the poor people. Wali is the type of person that will give you the shirt off his back. Wali is truly a joy to be around. My son is also an excellent writer who has been writing screen plays since the age of 11.  He has an amazing athletic ability he plays all sports from basketball, football and baseball. I'm heartbroken that with all his talents and support he still ended up in this situation.

Your Honor, if given the opportunity I know that my son can be a productive member in society. I am seeking the mercy of the court when you sentence my son. I hope that you will reach deep within in making that decision and that he can be given a second chance at life.


Thank you for your time and God Bless.


Jacqueline Sheppard

December 29, 2016

Dear Judge Engelmayer,

My name is Dakesha Merill and I am Wali Burgos' girlfriend. I have known Wali for the last 10 years. We grew up together and we were childhood sweethearts. I know that Wali has made mistakes in his life and I have no excuses for that. I just want you to know that he is more than his mistakes. For the longest time he was very angry. A good friend of his was murdered and after that he became a different person. After he beat the state case he was good for a while but then he got cut up and beat by a group of people in our neighborhood. I was there when it happened and it was horrible (sometimes it plays over in my head as if it was yesterday). We were walking in our own little world when the guys came from out of nowhere and started jumping him I didn't know what to do or how to react, in the blink of an eye I just saw blood from his face so I rushed over to him and realized he was bleeding from his arms and face also. It was like a nightmare, but he didn't realize he was cut until I said something. So I started to try to hale for a cab but no can would stop, so we started walking and I saw a cop car and flagged it down. During his healing process I was like a nurse for him I had to wash him clean his cuts put his cream on them etc. After he had got cut up it changed him, he was really depressed and always wanted to stay in the house I had to force him to go outside and get air, so we would go for walk in the park. I tried my best to keep him from being in a dark place. None of this is an excuse for what Wali has done, but I wanted you to know that even despite the bad Wali is still a very kind, loving and generous person. He has always been my rock whenever I needed him the most. He always tries to be there for me the best way he can. Always been my shoulder to lean on, my biggest supporter, he always pushed me to do better in life and to finish school and to always follow my dreams. I may say when it comes to me or our relationship he is the sweetest. He's all I asked for even though this is happening. He will have my support when he comes home and I respectfully ask that you have mercy on him at sentence.

Thank you for your consideration,

Dakesha Merill

October 1, 2016

The Honorable Paul A. Engelmayer
United States District Judge Southern District of New York
Thurgood Marshall Courthouse 40 Foley Square
New York New York, 10007


Hello, my name is Andre Barnes and Wali-Andre Burgos is my nephew. I was adopted by Wali's grandmother Brenda Burgos when I was 15 years old. Khalid Burgos (Wali's father) along with our other siblings have created an unbreakable bond. Wali was named after his uncle Waled Burgos and myself Andre. I believe this is a testament to the type of family he comes from. I also got involved with the wrong crowd as a teen. After having been adopted by this family I was given the love and support I needed, and I have never turned back ever since. I am a recording artist and have been since 1989. My professional name is "A.G." and I have been the center of 20 or more recording albums. I am 46 years old and have been involved in Wali's life since his birth.

Wali comes from a very loving family but in my opinion, was negatively influenced by the environment he was raised in. Everyone in our family are hard workers and dedicated to uplifting ourselves. It is my opinion that this hard work is part of the reason Wali was left to be influenced by his peers as he had a lot of spare time on his hands. I understand that Wali is taking the first step into the right direction by admitting his guilt and paying his debt to society. Of course my views about Wali are biased because I love him so dearly since he was born. However, the love he shows his aunts, uncles, grandmothers, and especially his cousins and brothers are unconditional and a reflection of his true heart.

Judge Englemayer, I plead to you to give this young man some room for improvement and a chance to redeem himself and his family's name and honor. I do understand a penalty has to be given for his actions, I just wish and pray that he can be returned to us with time to make a difference in this life.

Thank you for taking the time to read this letter, and regardless of whatever your judgment about Wali is, I know it is with more experience than I have in these matters.


Respectfully,


Andre M. Barnes

The Honorable Paul A. Engelmayer

United States District Judge

Southern District of New York

Thurgood Marshall Courthouse

40 Foley Square

New York, New York 10007

September 30th, 2016

I Asia Burgos am writing this letter in connection with Wali Burgos's sentencing of his guilty plea. I am the director of finance at the Addicts Rehabilitation Center located on 73 East 128th street NY, NY 10035.

Since Wali was a child, he was my son. I was already the mother of my beautiful daughter Tyler Burgos (Wali's older cousin) but, Wali helped fill the void in my heart of wanting a son. My family is a family of tradition and we believe in the phrase "It takes a village to raise a child". Being the tight knit family that we are, my siblings and I always exposed our children to the best life had to offer. Taking family vacations, having barbecues, or just spending the weekend together is some of many activities my family always participated in. Wali being the handsome young man he is, was always a ladies man. Even as a child he knew how to charm the ice cream money right out of your hands. He was a child you enjoyed having around because of his silly, fun and charming nature. Wali and my daughter Tyler are a few years apart but that did not put a dent in their relationship. Wali looks up to my daughter as a big sister and communicates and connects with me as a mother figure in his life. It didn't matter if it was about school, girls, basketball or any other teenage boy topic; Wali and I talked about it. Wali has a family that loves him and will support him in any manner to the end of earth. Some people are not fortunate enough to have the type of upbringing the Burgos family has. We stick together and support each other no matter what and even if we do not agree with the decisions each other make, it never stops us from loving and wanting what is best for each other. As a parent you raise your child to the best of your ability and you instill in them the tools and wisdom they would need to be good people and successful in this world. As a parent you make sacrifices to ensure that your children can be better than you and sometimes unfortunate things happen. I believe in my heart that my Nephew Wali Burgos is an amazing kid and with a second chance I feel that he will exceed everyone's expectations in becoming a better man in society. He has the love and a huge support system, all he needs is the opportunity to show his growth and right all of his wrongs. Watching Wali grow up and be in this predicament is really horrific because I know that my nephew is not a bad person. I do believe that we are all human and make mistakes. Sometimes some mistakes are more severe than others, but everyone deserves a shot at redemption. I hope that with this letter you could find it in your heart to give my nephew a second chance at life. He is still young and as a lot of growing up to do and I have faith in the man I helped raised him to be.

Thank you for your time,

Sincerely,